### BELLE ZAPOLSKY *v.* MORRIS SACKS ET AL.
### (11000)

PETERS, HEALEY, SHEA, GRILLO and SPONZO, Js.

Argued May 5—decision released August 23, 1983

*Alvin M. Murray,* for the appellants (defendants).

*Jonathan J. Einhorn,* for the appellee (plaintiff).

SPONZO, J. In this appeal from a judgment awarding damages for breach of contract and ordering a reconveyance of property because of fraud, the defendants claim that the court erred in that (1) it failed to conclude that the statute of limitations barred the plain-

tiff's recovery of a portion of damages under a certain agreement and (2) it concluded that the defendants participated in a fraudulent conveyance.

In a well written memorandum of decision the trial judge detailed the following facts which are substantially unchallenged: On August 21, 1963 the plaintiff Belle Zapolsky (then Belle Russin) and the defendant Morris Sacks entered into a written agreement for the organization and management of a corporation. This agreement provided that the corporation would be the medium of a joint venture through which the parties would equally own, improve and operate certain property owned by the plaintiff and known as 762–768, 770–774 Grand Avenue, New Haven, and consisting of eighteen apartments and five stores. These buildings were in a state of disrepair and in violation of governmental building codes. Under the terms of the agreement the plaintiff, a resident of Philadelphia, conveyed these properties to Belmor Realty, Inc., in return for 50 percent of the outstanding shares of stock. Morris Sacks received 50 percent of the shares of stock in return for his promise to manage the property and to pay for all repairs, renovations and improvements necessary to bring the property and buildings into full compliance with the building codes.

Paragraph 12[1] of the 1963 agreement provided that the plaintiff would receive minimum annual payments

---

[1] Paragraph 12 of the 1963 agreement provides as follows: "In consideration of Belle Russin's agreement to transfer said real property to the Corporation and to enter into this agreement, Morris Sacks hereby convenants, agrees and *personally guarantees* that Belle Russin [Belle Zapolsky] shall receive from the Corporation as salary, bonus and/or dividends in aggregate an annual amount which shall not be less than Three Thousand Dollars ($3,000.00) per annum for each of the first two (2) twelve month periods after the date of this agreement [August 21, 1963], and which shall not be less than Four Thousand Dollars ($4,000.00) per annum for each twelve month period thereafter. *Morris Sacks covenants, agrees and personally*

of $3000 for each of the first two years and of $4000 per year thereafter. If Belmor, Inc., did not make the annual payments in full, the defendant Morris Sacks personally guaranteed that he would pay the minimum amount. While the first two annual payments were made, only partial payments were made to the plaintiff between 1966 and 1974, at which time payments ceased entirely.

Upon that default the plaintiff, through her attorney, made numerous demands for payment. On March 31, 1976 Morris Sacks proposed that the plaintiff execute a general release discharging all claims against him in exchange for $7000. The plaintiff refused to sign such a release whereupon the defendant Morris Sacks issued a check in the amount of $7000 containing no restrictions. The plaintiff applied that check against the underpayments for the years 1966–1971 and also treated it as a portion of the payment due for 1972.

On March 2, 1978 Morris Sacks quitclaimed to his wife, the defendant Bella Sacks, his interest in their residence. After the conveyance, both defendants continued to live in the home and Morris Sacks continued to pay the mortgage and other bills associated with its maintenance from his income. The parties stipulated that Morris Sacks' equity in the home was approximately $36,750 when he made the conveyance to his wife. The defendants contend, however, that at the time of the conveyance, Morris Sacks owed Bella Sacks

guarantees that, in the event Belle Russin shall receive less than said minimum annual amount from the Corporation in any year as aforesaid, he will personally pay directly to Belle Russin the difference between the aggregate amount received by her from the Corporation and the minimum amount guaranteed to her under this paragraph. Provided, however, in the event that Morris Sacks shall purchase the interest of Belle Russin under Sections 14 or 15 of this agreement the guaranty provisions under this paragraph shall not be applicable for the year of said purchase." (Emphasis added.)

approximately $70,000. This indebtedness purportedly arose from loans made to Morris Sacks on his wife's certificate of deposit. The defendants, therefore, assert that Morris Sacks transferred his interest in their home only at Bella Sacks' request to decrease his debt to her and to provide her with "a little bit of security." The defendants further aver that at the time of the conveyance Morris Sacks was the sole owner of a realty holding corporation, Sacks Realty Company, which allegedly had a net worth of between $350,000 and $400,000. Indeed, they claim that he did not have a large number of debts when the conveyance to his wife was accomplished.

The defendants' first claim of error is based on the trial court's decision to include in its award sums due under the 1963 agreement which accrued prior to 1973. Although the defendants do not dispute that Morris Sacks breached the 1963 agreement before 1973, they argue that the trial court erred in denying their special defense that the statute of limitations barred claims arising prior to 1973. The defendants contend that the six-year statute of limitations upon any contract in writing embodied in General Statutes § 52-576[2] had run on such claims when the plaintiff initiated this action in March, 1979. They seek, therefore, a credit toward the money damages awarded by the trial court in the amount of $8012.91 plus interest computed on that

---

[2] General Statutes (Rev. to 1981) § 52-576 reads in full as follows: "Sec. 52-576. ACTIONS FOR ACCOUNT OR ON SIMPLE OR IMPLIED CONTRACTS. No action for an account, or for a debt due by book to balance book accounts, or on any simple or implied contract, or upon any contract in writing, shall be brought but within six years next after the right of action accrues; but persons legally incapable of bringing any such action at the accruing of the right of action may sue at any time within three years next after becoming legally capable of bringing such action. The provisions of this section shall not apply to actions upon judgments of any court of the United States or of any court of any state within the United States, or to any cause of action governed by article 2 of title 42a."

sum.[3] The plaintiff avers that Morris Sacks' partial payment of $7000 in March, 1976 constituted an acknowledgment of the entire debt which tolled the statute of limitations and prevented the defendants from raising it as a special defense. The defendants counter by asserting that a debtor tendering payment has an absolute right to direct the application of the payment and that Morris Sacks intended the $7000 partial payment to be applied to his debts under the 1963 agreement prospectively from 1973.

Partial payment of a debt which is barred by the statute of limitations removes a case from the statute provided that, "under the circumstances, it constitutes an acknowledgment of the indebtedness sued upon as a then existing debt." *Clark* v. *Diefendorf,* 109 Conn. 507, 515, 147 A. 33 (1929). In *Wells* v. *Carson,* 140 Conn. 474, 476, 101 A.2d 297 (1953), we stated: "The Statute of Limitations creates a defense to an action. It does not erase the debt. Hence, the defense can be lost by an unequivocal acknowledgment of the debt, such as a new promise, an unqualified recognition of the debt, or a payment on account." *Buckley* v. *Buckley,* 144 Conn. 403, 411, 133 A.2d 604 (1957). Whether partial payment constitutes "unequivocal acknowledgment" of the whole debt from which an unconditional promise to pay can be implied thereby tolling the statute of limitations is a question for the trier of fact. *Apuzzo* v. *Hoer,* 125 Conn. 196, 200, 4 A.2d 425 (1939); *Clark* v. *Diefendorf,* supra, 515. "As with other questions of fact, unless the determination by the trial court is clearly erroneous, it must stand. *Kaplan* v. *Kaplan,*

---

[3] The defendants do not object beyond this claim to the trial court's award of damages under count one of the complaint. That portion of the award which has not been objected to includes the amount that Morris Sacks is required to pay in honoring the plaintiff's demand that he buy out her interest in Belmor, Inc. It also encompasses a sum due the plaintiff as a result of his mismanagement of the corporation.

186 Conn. 387, 392, 441 A.2d 629 (1982); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980); Practice Book § 3060D." *Turgeon* v. *Turgeon,* 190 Conn. 269, 275–76, 460 A.2d 1260 (1983).

A review of the record reveals that Morris Sacks initially conditioned his $7000 payment of March 31, 1976 on its acceptance as settlement of all claims then existing between himself and the plaintiff. After the plaintiff refused to accept such a proposal and sign a general release form, the defendant Morris Sacks tendered to the plaintiff a $7000 check which was unconditional on its face. Moreover, the record includes a letter from the plaintiff's attorney to Morris Sacks dated January 30, 1976 confirming that the $7000 payment would be merely a partial payment, on account. Morris Sacks never denied the accuracy of that letter. Indeed, the record is devoid of any documentary evidence to support Morris Sacks' contention that the $7000 check issued to the plaintiff constituted payment only for debts which arose subsequent to 1973 under the 1963 agreement. The evidence bearing on the factual issue of Morris Sacks' intent when he made the $7000 payment on March 31, 1976, therefore, adequately supports the conclusions drawn by the trial court. It cannot be said that the finding was clearly erroneous, i.e., "as a matter of law unsupported by the record, incorrect, or otherwise mistaken." *Kaplan* v. *Kaplan,* supra, 392.

The defendants' second assignment of error claims that the trial court incorrectly concluded that the transfer of Morris Sacks' interest in their family residence to Bella Sacks was a fraudulent conveyance. General Statutes § 52-552 governs the law of fraudulent conveyance and provides that "[a]ll fraudulent conveyances . . . made or contrived with intent to avoid any debt or duty belonging to others, shall, notwithstand-

ing any pretended consideration therefor, be void as against those persons only . . . to whom such debt or duty belongs." The question thus is whether the Sacks conveyance was fraudulent as against the plaintiff. "A fraudulent conveyance . . . is one made without substantial consideration and which renders the debtor unable to meet his obligation or one made with a fraudulent intent in which the grantee participated." *Denison Development Co.* v. *Gunther,* 189 Conn. 333, 335, 455 A.2d 1340 (1983).

The defendants argue that the only purpose behind the Sacks conveyance was to discharge, partially or entirely, substantial loans in the past from Bella Sacks to Morris Sacks and to provide her with "a little bit of security." They contend that it was Bella Sacks who requested the Sacks conveyance and that she was not privy to her husband's financial condition at that time. The defendants maintain that this substantiates their claim that the Sacks conveyance was not intended to protect Morris Sacks' assets from his creditors.

Whether the Sacks conveyance was made with a fraudulent intent by the grantor which the grantee participated in by accepting the conveyance is purely a question of fact. *Mathews* v. *Converse,* 83 Conn. 511, 513-14, 77 A. 961 (1910). "The determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances." *Town Bank & Trust Co.* v. *Benson,* 176 Conn. 304, 308-309, 407 A.2d 971 (1978); *Knower* v. *Cadden Clothing Co.,* 57 Conn. 202, 221-22, 17 A. 580 (1889). Such a fact is, then, not ordinarily proven by direct evidence, but rather, by inference from other facts proven —the indicia or badges of fraud. *Wilcox* v. *Johnson,* 127 Conn. 539, 542, 18 A.2d 372 (1941); *Mathews* v. *Converse,* supra, 514. The record supports the finding of subordinate facts from which fraud can be inferred. The

close relationship between the defendants, Bella Sacks' testimony that she was afraid of losing the defendants' home, the failing circumstances of Belmor, Inc., at the time of the Sacks conveyance[4] and the unsatisfactory and apparently evasive character of Bella Sacks' testimony which did not substantiate the claims made by Morris Sacks regarding his intent to repay loans to her are evident in the record and are the usual indicia or badges of fraud. *Wilcox* v. *Johnson,* supra, 542. A factual finding based on inferences reasonably drawn from the evidence will stand. *Burwell* v. *Board of Selectmen,* 178 Conn. 509, 511, 423 A.2d 156 (1979). Moreover, a finding based on a determination of the credibility of witnesses cannot be disturbed. "It is axiomatic that it is in the province of the trial court to assess the credibility of witnesses." *Hughes* v. *Contemporary Mission, Inc.,* 180 Conn. 150, 151, 429 A.2d 827 (1980).

There is no error.

In this opinion the other judges concurred.

---

[4] It is undisputed that Belmor, Inc., was, at the time of the Sacks conveyance, adversely affected by sharp and rapid deterioration of the neighborhood where the Grand Avenue property is located.